PALLY PEASE, Appellee, v. CITIZENS STATE BANK OF EARLHAM, Appellant.

**NEW TRIAL: Grounds—Affirmatively Unsupported Issue.** A new trial
1 must necessarily be granted when the court refuses to direct a
verdict and the jury finds in favor of plaintiff's essential issue and
the record affirmatively shows that the *contrary* of such issue is true.

**EVIDENCE: Relevancy, Materiality, and Competency—Exhibits Bearing**
2 **on Nonissuable Matter.** In an action for damages consequent on the
making of improper loans, exhibits bearing on loans should be con-
fined in their admissibility to the loans to which they have appli-
cation.

Headnote 1: 29 Cyc. p. 820. Headnote 2: 7 C. J. p. 757.

Headnote 1: 20 R. C. L. 273.

*Appeal from Madison District Court.*—W. S. COOPER, Judge.

JULY 1, 1927.

Action at law to recover damages predicated on the negli-
gent manner in which the defendant-bank loaned plaintiff's
money, which, it is alleged, was loaned under an oral contract
made in 1916, between the plaintiff and the defendant-bank.
Cause tried to a jury, the trial resulting in a verdict for the
plaintiff. Defendant appeals.—*Reversed.*

*J. W. Rhode, John A. & W. T. Guiher,* and *William E.
Miller,* for appellant.

*White & Clarke, A. W. & Phil R. Wilkinson,* and *H. L.
Bump,* for appellee.

DE GRAFF, J.—Plaintiff's petition, filed January 30, 1924, is
in five counts, each of which involves a loan made to a different
borrower. Count 3 is the only count to which this appeal re-
lates, as the jury found in favor of the defend-
1. NEW TRIAL: ant-bank on the other four counts. The contro-
grounds: af-
firmatively un- versy in question involves what is known in the
supported issue.
record as the Loren Dunbar loan. The primary
and controlling propositions relied upon for a reversal have to
do with certain matters contained in the defendant's motion for

new trial, involving certain instructions given and the sufficiency of the evidence to sustain the verdict. Before we review these propositions, it is well to state and understand the issues in this action.

The plaintiff pleads, in his amended petition, that, in April, 1916, he made an arrangement with the defendant-bank, through Harry W. Hill, its cashier, whereby plaintiff intrusted to the bank notes and money, for the purpose of making safe and prudent investments, upon the good judgment and fidelity of the said bank, and of prudently investing said funds in loans, and collecting and re-loaning same, subject to and with the approval of plaintiff's son-in-law, Arthur Marks, and of Mr. Custer Couch, the then assistant cashier of said bank; and that the loan in question was made in violation of said oral agreement, and without the approval of said Couch and of said Marks, and without the approval of the plaintiff. This is the only arrangement or agreement pleaded by the plaintiff. An issue was joined by the filing of a general denial by the defendant.

The trial court submitted two issues to the jury: One, the issue joined by the petition and answer of general denial, and the other, a voluntary issue based on the "theory of the case" doctrine. Of these in their order.

It must be borne in mind that the only contract of agency pleaded by plaintiff is as recited supra. Defendant's general denial defined and created the issue. The trial court properly placed the burden of proof upon the plaintiff, and in one instruction it is said:

"If you find from the evidence in this case that the plaintiff did accept all of said loans and the notes and mortgages in connection therewith [referring to the five counts of the petition], and approved and ratified said loans in person, knowing that the same had not been submitted to or approved by said Marks, and without demanding his approval, then plaintiff is now estopped from claiming that such loans should have been so approved; and the fact, if it be a fact, that the same were not approved by Marks is immaterial."

This was the law of the case in this particular matter.

It is conclusively shown that the plaintiff did approve the Dunbar loan, which was made in 1920, and that neither Marks nor Couch did approve or have anything to do with said loan.

Couch, in July, 1917, left the employment of the bank, and thereafter resided in California. Marks was not connected with the bank, and in 1920 was *persona non grata* with the plaintiff.

The approval of Couch and Marks is pleaded as a condition of loaning. The trial court left out Couch entirely, and the plaintiff did not plead or offer testimony to the making of any other or different agreement between himself and the defendant-bank, at any other later or different time. Plaintiff himself testified that he had no recollection of having made any other arrangement, and the plaintiff's witness Couch testified, by deposition, that "plaintiff was advised by Harry W. Hill and myself that the first loans offered were O. K.;" and that later, the conversations were between the plaintiff and Harry W. Hill, and, "I do not know what the agreement was." The first loans to which this witness refers have no relation or bearing on the loan in question. Under the instant record, it must be accepted that the original agreement, as pleaded, was abandoned by the plaintiff.

It is conclusively shown that the Dunbar loan originated in March, 1920, and that it received the approval of no one except plaintiff. It is quite apparent that plaintiff waived any right to have the loan approved, as provided in the pleaded contract, and under the instruction of the court "was estopped" from claiming that said loan should have been so approved; and, had no testimony been offered by the defendant-bank as to Hill's relation to the instant loan, a motion to direct a verdict in favor of the defendant would have been sustainable.

We now turn to the voluntary issue submitted by the court in the instructions to the jury. In one instruction it is said that:

"It is the claim of the plaintiff that all loans were to be made with the approval of Arthur Marks, and if you so find, and you further find that the arrangement for loaning funds was made by plaintiff with the defendant-bank, and not with Harry W. Hill, as an individual, then the defendant-bank would be liable for losses, if any, sustained by plaintiff, on loans made without such approval, unless you find that plaintiff is estopped from claiming that such approval was necessary."

In another instruction bearing on the voluntary issue it is said that:

"The plaintiff must establish by the greater weight of the

evidence that, in making whatever arrangement, if any, which was made between plaintiff and said Harry W. Hill at said time, that said Harry W. Hill was not acting for himself, but was acting for and on behalf of the defendant-bank.''

As stated, there was no such issue defined by the pleadings.

Under the ''theory of the case'' doctrine, if the parties, by their own mutual act and acquiescence, try out issues not formally pleaded, the trial court should submit, under proper instructions, such issues. *Des Moines Asph. Pav. Co. v. Lincoln Place Co.*, 201 Iowa 502.

The fact that Hill was cashier of the defendant-bank does not mean that he could not have a private loan business and act independently of the bank in such matters. The question is, under the voluntary issue, did he act as such individual? The burden was upon the plaintiff to prove, by a preponderance, that the bank, and not Hill, as an individual, acted for the plaintiff in the instant matter. Appellant contends that the evidence does not support this finding, and that the trial court erred in this particular in overruling the defendant's motion for new trial. The defendant did offer evidence, under its general denial, that Hill, at the time in question, was not acting for the bank, but as an individual; and if we assume, *arguendo*, that the voluntary issue was properly submissible in this case, we must find the necessary evidence to sustain a verdict on this issue.

The Dunbar loan must be viewed, in its chronology, as having two phases. It originated as a personal loan of $10,000, belonging to plaintiff, March 24, 1920, and unsecured, except by the signatures of Loren Dunbar and his wife Belle to the two notes of $5,000 each, due in one year. Both notes were payable to Harry W. Hill. On that date, Hill transferred them to plaintiff, making out and filing in the bank a debit slip, charging the notes to plaintiff. There is no showing that the bank had anything to do with the matter, except that a debit slip was made by Hill to the deposit account of plaintiff in the bank. At that time, Dunbar's credit was good.

It also appears that Hill received a commission from Dunbar in connection with this loan, and the plaintiff's account was credited by Hill with $50 on this commission. Plaintiff understood that he was to get the commission. The evidence is quite conclusive that this original transaction was made, as between

plaintiff and Hill, with plaintiff's knowledge, and was a transaction exactly similar to those which were recited in the other counts of plaintiff's petition, and which he failed to establish.

The Dunbar transaction occurred long after the original arrangement with the bank, as pleaded by plaintiff, and at a time when the original arrangement, as pleaded, had been abandoned. Plaintiff had, to quote his own language, "put the matter in Harry Hill's hands." The transaction was under the control of Harry W. Hill. The bank kept no record or any account of the notes, and received no compensation for handling this and other similar transactions. Harry W. Hill, at the time, was doing business on the side in the matter of loaning money, without any relation to the bank. He made farm loans. He was an officer of the Federal Farm Loan Association, was treasurer of the Earlham Farm Loan Association, and represented a number of farm loan companies. From 1918 to 1922, inclusive, his farm loans amounted to from three to four hundred thousand dollars a year. He had funds of private parties to loan,— approximately two hundred thousand dollars a year. To these loans the bank had no relation, and received no compensation or commission.

The bank officers knew that Harry W. Hill was making loans for private parties, and the bank never did act in that capacity. The plaintiff was known as one of the depositors of the bank, and nothing else. These facts are not disputed, and are abundantly established by the evidence. As typical of the record in this regard we quote from the testimony of W. H. Williams, cashier of the bank from 1918 to 1923, and president thereafter:

"The only connection Pally Pease [plaintiff] had with the bank while I was there was that of depositor, except that he borrowed some money there in the fall of 1921. From the time I went there, Harry W. Hill made loans for Pally Pease,—he charged Pease's account with debit tickets for the amount of the loan he made for him. Debit tickets are usually used in the absence of the customer himself, and are used on the authority of the customer, and are charged up against the account of the customer, just like a check signed by him. The bank had nothing more to do with the loan, other than to charge the debit slip, as it did a check. At the time I was elected president, Mr. Hill

turned over to me and left in my charge the case that contained the private papers in connection with the loans he had been making. Among them were the Pally Pease loans. When the Pally Pease papers were turned over to me, they were in a note case or bill file. The officers or employees of the bank had no access to that case or bill file. Harry W. Hill was the only person who had access to it."

The assistant cashier of the bank testified that Mr. Hill handled the Pally Pease business personally. He further testified:

"I know the bank never owned the Dunbar loan. None of the bank's papers or property were kept in the place where those papers and securities of Mr. Pease were kept. I had no access to Mr. Hill's property, notes, etc., nor those private loans that he made. I had access to the bank's business, but not to Mr. Pease's loan business. His private loan business was kept in a bill fold which Mr. Hill had. His checking account was kept in the regular ledger of the bank. Our bank did not make loans for persons who had money and wanted to loan it out."

The record is clear that the bank did not make loans of private funds, and whatever loans Mr. Hill made in a private capacity had nothing to do with the books and records of the bank; and there is no evidence in the record that any relation of principal and agent existed between the bank and Pease after Couch left, July 1, 1917. We conclude, after an examination of the record facts, that there is no legal justification upon which to base the recovery of the $10,000 part of the Dunbar loan from the defendant-bank.

We now turn to the second phase of the Dunbar loan. On March 17, 1921, Harry W. Hill took a note signed by Loren Dunbar and his wife, Belle, for $17,500, payable to Harry W. Hill or order, due in two years, with 8 per cent interest. This was a renewal and a securing of the $10,000 loan of March 24, 1920, bearing 7 per cent interest. At the time of the renewal, the Dunbars executed and delivered to H. W. Hill, the mortgagee named therein, a mortgage on real estate, to secure the note. This mortgage was acknowledged March 19, 1921, and recorded March 21, 1921. Hill executed a written assignment of this note and mortgage to the plaintiff, Pease, and acknowledged

same March 28, 1921, which assignment was filed for record March 6, 1923.

Mr. Hill was killed March 24, 1923, in the Randolph Hotel elevator accident, and prior to his death, he had severed his connection with the bank, and was planning to leave for California on the evening of the day of his death. It may be further stated that, at the time of the assignment, Hill indorsed the note to plaintiff, or order, without recourse, and on the same date, entered the usual debit slip at the bank.

In the fall of the year 1921, the plaintiff applied to Hill for some $6,000, "as he had a deal on." Plaintiff testified:

."I had a note for $6,000, made out in his own handwriting. That was the amount I was trying to get from him. Well, I was going to use that money. I had a deal on. He told me he would let me have the money to go ahead and close the deal. He would not let me sign the note until I signed that,"—referring to what is known in the record as Exhibit V, made October 3, 1921, containing a list of plaintiff's notes, including the Dunbar note, to which exhibit there is attached a letter reading as follows:

"Earlham, Iowa,
"November 1, 1921.

"The above is a list of my notes held by Harry W. Hill of Earlham, Iowa, for me—which loans have been made at different times by Harry W. Hill with my approval. The above notes I herewith turn to Harry W. Hill as collateral to loans he or the Citizens State Bank of Earlham, Iowa, have made to me or may make to me. Interest on collateral loans to be collected by said Harry W. Hill and above described collateral notes to be renewed or collected as said Harry W. Hill sees fit.

"Pally Pease."

The notes referred to in Exhibit V, with three exceptions, bear date during the years 1920 and 1921. The exceptions bear date, respectively, one of 5-19-17, one 5-13-18, and one 3-19-19.

On November 5, 1921, plaintiff wrote a letter in which he speaks very critically to Hill for making plaintiff give notes for borrowed money, instead of "taking over some of the notes I hold. It was stinking to make me sign what I did before he would close the deal last Tuesday." In a letter dated June 6, 1922, written by plaintiff to Hill, he says:

"Please pay off the notes you hold against me with the first money that comes in for me, and re-loan all other money that comes in unless you hear differently from me."

It is plain from the record that the relations of plaintiff with Mr. Hill continued along the old lines until Mr. Hill severed his connection with the bank, in 1923.

The record is barren of any showing that the Citizens State Bank had any connection with the private affairs of plaintiff, except to carry his balance in the bank, subject to check by plaintiff or debit slip made by Hill as the agent of Pease. The relation between plaintiff and the bank was that of debtor and creditor, and it was clearly such after Couch left the bank, in July, 1917. Plaintiff's own evidence refutes any other relationship. As heretofore stated, the Dunbar loan originated between two and three years after the original arrangement which plaintiff pleads in his amended petition, which arrangement ceased to function, under the evidence offered by the plaintiff.

It is the claim of plaintiff, however, that, at the time that the original Dunbar note was renewed and increased in amount, Dunbar used about $6,000 thereof, at the instance of the bank, to take up notes of Dunbar's which the bank held, and that, at the same time, the bank took a chattel mortgage from Dunbar for $8,000, to cover certain short-time loans which the bank had made to Dunbar of its own funds in the fall and winter of 1920-21, after Hill had loaned the original $10,000 to Dunbar, in March, 1920. The details of this transaction are not altogether clear. Mr. Hill was dead, and Mr. Dunbar is not explicit in all the details.

Since a reversal must be ordered as to the first phase of the Dunbar loan, we will not pursue the inquiry further as to the liability of the bank in the matter of the $7,500 under the respective contentions of the parties hereto. The evidence is in apparent conflict as to this matter.

One other matter may be given brief mention. The court admitted, and submitted to the jury, over objection, plaintiff's exhibits Nos. 54 to 77, inclusive, which were transcripts of notes, chattel mortgages, confessions of judgment, and bankruptcy proceedings, none of which pertained or related to Dunbar, but did have reference to other debtors to the

2. EVIDENCE: relevancy, materiality, and competency: exhibits bearing on nonissuable matter.

plaintiff, Pease, and related to dates subsequent to the Dunbar loan. With respect to these exhibits the court instructed:

"Some transcripts of judgments, against some of the persons liable on some of the notes involved herein [referring to the five counts in the petition], and several transcripts of deeds and mortgages and a note purporting to have been executed by some of such persons, have been admitted in evidence in this case. These have been admitted and should be considered by you only for the purpose of aiding you in determining the financial condition of such persons at the time of the making of the loans complained of, and at this time, and should be considered for no other purpose."

It is to be remembered that, at the time of this trial, the petition of plaintiff was in five counts, and that these counts involved different loans to different borrowers, and had no relation to the Dunbar loan. They were simply loans which the plaintiff claimed were made by the defendant-bank *mala fides,* and "all fraudulently made for the purpose of carrying out some private purpose of the said defendant-bank." These exhibits should not have been admitted, at least on the claim of plaintiff against the defendant-bank as to the Dunbar loan. These mortgages, judgments, etc., were of a later date than the Dunbar loan, and reflected conditions after the Dunbar loan had been made. The prudence and fidelity which the plaintiff alleged to have been owed by the bank were of the time the Dunbar loan was made. These exhibits were not only irrelevant, but prejudicial.

For the reasons stated herein, the judgment entered is— *Reversed.*

EVANS, C. J., and FAVILLE, ALBERT, and KINDIG, JJ., concur.