L. A. ANDREW, State Superintendent of Banking, Plaintiff, v. CITIZENS STATE BANK OF BEDFORD, Defendant.

MRS. R. E. WEAVER, Intervener, Appellant, v. L. A. ANDREW, Receiver, Appellee.

No. 40695.

APRIL 10, 1931.

REHEARING DENIED JUNE 20, 1931.

650

F. D. Wisdom, for appellant.

Frank Wisdom, for appellee.

GRIMM, J.—The intervener is an elderly lady who for many years and during practically all, if not all, of the time involved in this case, has lived in California. She was a relative of Frank Dunning who, either alone or in partnership with another, operated a private bank in Bedford, Iowa, known as the Citizens Bank. Frank Dunning was the ruling spirit in the bank.

The intervener, as is shown by the record, had complete confidence in the personal integrity and business capacity of Frank Dunning; and acting upon said confidence, she passed to him from time to time available funds in her hands in order that he might invest the same for her. It is her claim that Dunning orally agreed to invest said funds, secured by first mortgages on land with good margins and to yield six per cent. interest.

It appears from the record that she left entirely to said Dunning what the investments should be and how her funds should be handled. According to some statements appearing in the record, the intervener began furnishing these funds to Frank Dunning on October 1, 1907. The intervener continued to make deposits and draw checks and on February 14, 1914, she had a balance to her account of $14,900.00.

It does not definitely appear, but it is fair to assume from the record, that in the early stages of this transaction, the intervenor's account with the said private bank was a checking account; but later, in 1914, these funds belonging to the intervenor were in the hands of the Citizens Bank for the purpose of being loaned or invested for the account of the said intervenor.

On August 24, 1914, the account showed a balance of $15,300.00 to the credit of the intervenor. From time to time the intervenor's account with the Citizens Bank was charged

with amounts used in purchasing certain notes which then became the property of the intervenor. Some Liberty Bonds were purchased, and occasionally charges were made on the principal for the intervenor's personal account.

On June 1, 1920, what was the Citizens Bank, a private concern, became incorporated as the Citizens State Bank. Dunning continued to be the moving and controlling spirit of the Citizens State Bank, as he had been of the private concern which preceded it. The corporation continued without interruption the business previously conducted by the private bank. The intervenor's account was carried along on the same ledger sheet.

Frank Dunning died March 1, 1924. During all of the intervening years, Frank Dunning had given close personal attention to the affairs of the intervenor. She not only confided in him because of the relationship which existed between them, but because of her complete confidence in his integrity and business capacity. He was giving close personal attention to her affairs because of the relationship and because he realized the intervenor was not, on account of age and lack of business experience, able to handle her own affairs.

The record clearly shows that, regardless of whether the accounts were kept in the Citizens Bank, the private concern, or in the Citizens State Bank, the incorporated bank, Frank Dunning continued to handle the intervenor's affairs as a purely personal matter. He was her personal agent, with full authority from her to invest and loan her money. Moreover, there were no limitations placed upon him, whatever.

After the death of Frank Dunning, his daughter, Frances M. Dunning, who had been connected with the bank in one capacity or another for many years, personally took up the burden of looking after the intervenor's· property where Frank Dunning laid it down, at the time of his death. It clearly appears that this daughter, who fully understood the relationship between Frank Dunning and the intervenor, proceeded promptly to take on the same relationship with the intervenor; and in a letter dated August 12, 1924, she used the following expression:

"I understand what you mean about your business matters being kept confidential between us, and I shall be careful to keep your business affairs to myself. Papa always taught me

to be closemouthed when it came to business, so I am used to keeping such things.''

This was approximately four years after the State Bank had been organized, and it clearly reflects the relationship of the parties. Frances Dunning had stepped into the shoes of her father and she was keeping the intervenor's business closely to herself, indicating clearly that she was acting as the personal agent of the intervenor and negativing quite clearly any thought or suggestion that the Citizens State Bank was acting as the agent or representative of the intervenor in the matter of her investments.

The Citizens State Bank closed its doors on the 27th day of September, 1929. When the receiver took charge, there was found in the bank vaults an envelope marked ''R. E. Weaver's papers''. It contained the following notes—Stephens, $4,000.00; Bishop, $6,000.00; Crum, $5,404.63. In other words, the envelope marked ''R. E. Weaver's papers'' contained notes and mortgages securing the same aggregating $15,404.63. These notes were tendered by the receiver to the intervenor and by her refused.

It will be noted that these notes and the mortgages securing the payment thereof were, in a sense at least, segregated from the papers of the bank. The endorsement on the envelope in which they were contained indicated the notes and mortgages were the property of the intervenor. It also appears from the record that for a considerable period of time the sum of $75.00 was forwarded to the intervenor each month as income on these notes and that if the money with which to make this payment to the intervenor was not on hand Frank Dunning himself, from his personal funds (his salary) made the payments.

The employees of the private bank, and later the employees and officers of the Citizens State Bank, had little or no information concerning the intervenor's account, except the mere book-keeping notations. Everything pertaining to the intervenor's account was handled personally by, or directed by, Frank Dunning and later by his daughter, Frances Dunning. It quite satisfactorily appears that although the items were run through the bank, the transactions were in reality no part of the bank's business and the entries on the bank books were mere matters

of convenience of record in the transaction between the Dunnings and the intervenor.

It appears that in 1928, H. A. Weaver, a son of the intervenor, who lived in Kansas City, Missouri, came to Bedford for the purpose of examining into the condition of his mother's affairs. He conferred fully with his relative, Miss Frances Dunning. It appears that these notes were secured by second mortgages and that the son did not regard the security as good. As a result of his investigation and perhaps protests, two letters were issued by officers of the bank. Frances Dunning, as Assistant Cashier, issued a letter under date of December 10, 1928, in which she described the notes and the mortgages securing the payment of same. In reference to one of the notes, she says:

"The offer has been made to the bank to take over 240 acres with a first loan of $21,000.00 and the bank to release the above mortgage of $6,000.00 which R. E. Weaver holds one note of $4,000.00. In case this might be done R. E. Weaver would be protected on same by the Investment Co. and Bank."

It does not very clearly appear what the Investment Company is, but apparently it was one of Dunning's organizations.

In reference to another mortgage owned by the intervenor, Miss Dunning states:

"The second mortgage of $6,000.00 on 160 acres of land owned by I. L. Bishop and Hattie Bishop wife is owned by her. The loan is past due since April 25th, 1926. The bank plans to take a new loan and put same against the entire 440 acres which now has $33,000.00 in first loans against same. Mr. Bishop has a personal property over $10,000.00."

In reference to Mrs. Weaver's $5,000.00 Herbert Crum loan, the Assistant Cashier wrote as follows:

"The $5,000.00 Herbert Crum loan is to be paid out of the sale of the F. E. Payton land which the bank holds in their trustees for payment of all obligations made by Payton or guaranteed by him to the bank on its investors. The bank holds in trust over 2,000 acres of land with no second mortgages against same and with less than $50.00 per acre against the same as a first mortgage. As soon as this land is sold, this mortgage will

be taken up and the money to be reinvested in other loans of a much better nature.''

One J. U. Wyant, Cashier of the bank, issued a letter reading as follows:

''This is to certify that Mrs. R. E. Weaver has with the Citizens State Bank of Bedford, Iowa, at this date the following bonds and securities. Ten One Thousand Dollar Third Liberty Loan Bonds drawing four and one-quarter per cent interest, payable March 15th and September 15th of each year, and due in 1928. Also the sum of Fifteen Thousand Dollars invested in notes upon which said bank is paying Mrs. Weaver the sum of Seventy-five Dollars per month, this being the interest on the said Fifteen Thousand Dollars at the rate of six per cent per annum.''

The Liberty Bonds above referred to have been fully accounted for to intervenor and no question is here raised in connection therewith.

I. The intervenor's money was first deposited at Bedford by an oral agreement with her brother-in-law, Frank Dunning. He continued up to the time of the organization of the Citizens State Bank to handle her finances purely in a personal capacity. The whole record strongly indicates that after the incorporation of the Citizens State Bank, he continued to handle her matters in the same way. At all events, there is no showing of any agreement of any kind or character on the part of the Citizens State Bank to take over or become responsible for the obligations of Frank Dunning towards the intervenor in relation to her loans and investments.

If Frank Dunning was guilty of any improper conduct in the matter of handling the intervenor's property, it must be in violation of the private oral agreement existing between Dunning and the intervenor. There is nothing even to show that the officers of the incorporated bank, other than Dunning, knew anything about the oral agreement between Dunning and the intervenor. On the contrary, it quite clearly appears from the record that the employees and other officers of the incorporated bank knew nothing about the details of said agreement. They knew little or nothing about the intervenor's affairs except that Dunning would give orders and directions in reference to entries

and payments of interest. They knew also that if the interest was not forthcoming in time to keep up the steady stream of monthly payments of $75.00 as interest, Dunning himself paid out of his salary the amount to make up the monthly payments.

Intervenor's relations with the private bank were not those of a mere depositor. Dunning was authorized to invest, collect and reinvest her funds. He had full and unrestrained power and authority to deal therewith. What his obligations may have been do not clearly appear. Whether he was an agent or trustee is not shown and is not very material. Suffice it to say there is no showing that any money, note or bond or other thing of value belonging to intervenor in the possession of Frank Dunning ever passed into the possession of the Citizens State Bank, except as found in the envelope hereinbefore described or otherwise accounted for.

There is absolutely no evidence that the Citizens State Bank ever undertook to discharge any of Dunning's obligations to the intervenor. There is no evidence upon which to base any kind of novation. The essentials of a novation are well established and well understood, and authorities need not be cited.

II. The intervenor claims for these letters, hereinbefore set out, among other things, that they amounted to an assumption on the part of the bank of the obligations of Dunning to the intervenor.

In the first place, it is not claimed that Dunning did not have authority to invest intervenor's funds. He had been doing so for years with intervenor's consent. Whether he violated his agreements in any manner is not a matter for investigation in this action.

The letters in question cannot, by any reasonable interpretation, in light of the undisputed facts in this case, be construed as an authorized assumption by the bank of Dunning's contractual obligations with intervenor.

The Liberty Bonds are not in issue.

The notes into which the balance of intervenor's funds have been traced are conceded to belong to intervenor and they have been tendered to her as her property.

The investment of intervenor's funds by Dunning was fully authorized by the intervenor. The securities in which her funds were invested by Dunning have been fully surrendered

to her. No part of her funds has been traced into the assets in the possession of the Receiver. Under the facts in this case, there can be no such tracing.

The only possible purpose to be subserved by the intervenor in establishing the trust is that she may thereby be permitted to trace her funds into the assets of the bank. The evidence, without dispute, has traced these funds into Liberty Bonds and these three notes. The Liberty Bonds have been accounted for and the notes have been tendered to her. She has therefore had the full benefit of her trust remedy whatever it may be worth to her. The right of tracing ends when the funds are found. This tracing fully negatives the claim of the intervenor that her money went into the hands of the Receiver.

The principles of law involved are well established and understood. A citation of authority seems unnecessary, but see Border v. State Savings Bank, 202 Iowa 27. There we said:

"We have frequently said that, in order to impress a trust upon an alleged fund and thereby successfully assert a preferential claim therefor against a receiver, it must be established that the transaction giving rise to the claim involved a trust relation, whereby the wrongdoer stood in relation of a trustee to the injured party, and that the fund claimed is traceable into the hands of the receiver to the augmentation of the assets in his possession. City of New Hampton v. Leach, 201 Iowa 316; Danbury State Bank v. Leach, 201 Iowa 321. These essentials must find concurrence under the facts of a given case."

The intervenor has utterly failed to trace any of her funds into the money that was in the vaults of the bank or deposited to the credit of the bank at the time of the appointment of the receiver. The appellant has not traced any of her funds into any of the assets that came into the hands of the receiver. On the other hand, it clearly appears from the evidence that the intervenor's funds were in the Bishop, Stephens and Crum notes, aggregating approximately $15,000.00, and these notes have been tendered to the intervenor. The balance of her funds went into Liberty Bonds and they have been satisfactorily accounted for.

III. Was Frank Dunning, in making the investments for the intervenor acting in his individual capacity or in his capacity as an officer of the bank? The burden was on the in-

tervenor to satisfactorily show that Dunning was acting for the bank in such a manner as to bind the bank. In Mehaffy v. Roscoe Farmers Savings Bank, 210 Iowa 116, this court said:

''We are not unmindful of the rule that an officer of a bank may act in an individual or private capacity, and the burden is upon the plaintiff, to prove by a preponderance, that the bank did act for plaintiff in the transaction. Pease v. Citizens State Bank, 204 Iowa 70.''

A very careful examination of the record in this case satisfies us that the plaintiff has failed in this burden of proof.

The appellant has raised several other questions which, to some extent at least, are covered by what has hereinbefore been said. Each has been carefully examined and found without merit. It would unduly extend this opinion to deal with each of them separately. The record in this case is very voluminous. No good purpose could be served in quoting from the testimony. A thorough examination of the entire record abundantly satisfies us that the trial court correctly ruled and the cause therefore is affirmed.

FAVILLE, C. J., and EVANS, MORLING, KINDIG, ALBERT, STEVENS, and WAGNER, JJ., concur.